Lee S. Shalov (*pro hac vice* application on file)
Brett Gallaway (*pro hac vice* application on file)
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, Ny  10016
Telephone:     (212) 448-1100
Facsimile:     (212) 448-0066
*lshalov@mclaughlinstern.com*
*bgallaway@mclaughlinstern.com*

*Attorneys for Plaintiffs and the Putative California Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMANDA FRELKIN, TAYLOR KALIN, AARON GREGOROFF, SETH DOWLING, and DEBRA SPEICHER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation,<br><br>Defendant. | No. C 13-03451 WHA (lead)<br>No. C 13-04727 WHA (consolidated)<br><br><br>**PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES**<br><br>Date: July 2, 2015<br>Time: 8:00 a.m.<br>Judge: Hon. William Alsup<br>Ctrm: 8, 19th Floor |

1

# **TABLE OF CONTENTS**

2   TABLE OF AUTHORITIES ............................................................................................ i

3   INTRODUCTION ....................................................................................................... 1

4   STATEMENT OF FACTS ........................................................................................... 3

5         A. Apple's Check Policy Is A Uniform Written Policy ........................................... 3

6         B. The Necessity Of Bringing Bags and Phones to Work ....................................... 3

7         C. Apple Directs Managers To Consistently Enforce The Check Policy ................. 6

8         D. Every California Store Has Conducted Checks ................................................ 7

9         E. The Frequency of Checks Conducted At California Stores ............................... 8

10        F. Employees Wait For Checks to Be Conducted ............................................... 8

11        G. Apple Does Not Compensate Many Apple Employees For Checks ................. 10

12        H. Employees Have Complained To Apple Management About Checks ............... 11

13        I. The Check Policy Is For Apple's Benefit ...................................................... 11

14        J. Apple Can Easily Record Waiting Time For Checks ...................................... 12

15  ARGUMENT ......................................................................................................... 13

16      I. CERTIFICATION IS APPROPRIATE UNDER FEDERAL RULE 23(c)(4) ............... 13

17      II. THE REQUIREMENTS OF FEDERAL RULE 23(a) ARE SATISFIED .................... 15

18        A. The Class Is Ascertainable ...................................................................... 15

19        B. The Numerosity Requirement Is Satisfied .................................................. 16

20        C. The Commonality Requirement Is Satisified ............................................... 16

21          1. The Legal Framework For Plaintiffs' Claims And Apple's Defenses .... 17

22          2. Common Factual and Legal Questions .................................................. 17

23        D. The Typicality Requirement Is Satisfied ..................................................... 20

24        E. The Adequacy Requirement Is Satisfied ..................................................... 21

25      III. PLAINTIFF'S PROPOSED TRIAL PLAN ................................................... 22

26        A. Background ............................................................................................ 23

27        B. Plaintiffs' Proposed Trial Plan .................................................................. 23

28          1. Phase One ............................................................................................ 23

2. Phase Two ............................................................... 23

IV. M&S SHOULD BE APPPOINTED CLASS COUNSEL ........................................... 25

CONCLUSION .................................................................................................. 26

1

## **TABLE OF AUTHORITIES**

2

### **Cases**

3
*Akaosugi v. Benihana National Corp.*, 282 F.R.D. 241 (N.D. Cal. March 30, 2012) ..................... 16

4
*Bowerman v. Field Asset Services, Inc.*, 2015 WL 1321883 (N.D. Cal., March 24, 2015)............ 24

5
*Butler v. Sears, Roebuck and Co.*, 727 F.3d 796 (7th Cir. 2013) ..................................... 13

6
*Cervantez v. Celestica Corp.*, 253 F.R.D. 562 (C.D. Cal. July 30, 2008) ................................ 20, 23

7
*Cherry v. City College of San Francisco*, 2005 WL 6769124 (N.D. Cal. 2005)............................ 15

8
*Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012)................................. 24

9
*Frlekin v. Apple, Inc.*, 2014 WL 2451598 (N.D. Cal. Sept. 5, 2014) ................................... 5

10
*Garvey v. Kmart Corp.*, 2012 WL 2945473 (N.D. Cal. July 18, 2012)........................................ 20

11
*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992)........................................... 22

12
*In re Allstate Ins. Co.*, 400 F.3d 505 (7th Cir. 2005) ................................... 14

13
*In re Facebook Inc., PPC Advertising Litig.*, 282 F.R.D. 446 (N.D.Cal. 2012)............................ 17

14
*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2008)........................................ 22

15
*Jacks v. DirectSat USA, LLC*, 2015 WL 1087897 (N.D. Ill., March 10, 2015)............................ 14

16
*Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578 (S.D.N.Y. 2013) ........................................ 14

17
*Jimenez v. Allstate Insurance Co.*, 2012 WL 1366052 (C.D. Cal. Apr. 18, 2012).......................... 20

18
*Kurihara v. Best Buy Co., Inc.*, 2007 WL 2501698 (N.D. Cal., Aug. 30, 2007) ............................ 23

19
*Leyva v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013) ..................................... 24

20
*Lilly v. Jamba Juice Co.*, 2014 WL 4652283 (N.D. Cal., Sept. 18, 2014) ................................ 13, 16

21
*Mateo v. M/S Kiso*, 805 F.Supp. 761 (N.D. Cal. 1992) ........................................ 16

22
*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012) .......... 13

23
*Morillion v. Royal Packing Co.*, 22 Cal.4th 575 (2000) ................................................ 18

24
*Murphy v. CVS*, No. BC464785, Los Angeles County Superior Court (June 21, 2013) ................ 23

25
*O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311 (C.D. Cal. 1998) ............................... 16

26
*Ogiamien v. Nordstrom, Inc.*, 2015 WL 773939 (C.D. Cal. Feb. 24, 2015)........................................ 24

27
*Ortiz v. CVS Caremark*, 2013 WL 6236743 (N.D. Cal., Dec. 2, 2013)........................................ 18

28

i

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

*Otsuka v. Polo Ralph Lauren Corp.,* 2010 WL 366653 (N.D. Cal., Jan. 25, 2010) ................. 20, 23

*Quezada v. Con-Way Freight, Inc.*, 2012 WL 4901423 (N.D. Cal. Oct. 15, 2012) ........................ 16

*Riley v. California*, 134 S.Ct. 2473 (2014) ................................................................ 5

*Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611 (S.D. Cal. 2014)........................................ 21, 24

*Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466 (C.D. Cal. 2012) ........................................ 20

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) .................................... 14

*Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011) ................................................ 17

*Wolin v. Jaguar Land Rover N. Am. LLC*, 617 F.3d 1168 (9th Cir. 2010) ..................................... 22

## <u>Rules</u>

Federal Rule 23(a)(1) ...................................................................................... 16

Federal Rule 23(a)(3) ...................................................................................... 20

Federal Rule 23(c)(4) .................................................................................. 2, 3, 13, 14

Federal Rule 53 ......................................................................................... 2

## INTRODUCTION

Plaintiffs were hourly-paid employees of Apple, Inc. ("Apple") who worked at one or more of Apple's 52 retail stores in California (the "California Stores") from July 25, 2009 to the present (the "Class Period.")  Like many of the more than 12,400 hourly-paid and non-exempt employees at Apple's California Stores (collectively, the "Apple Employees" or the "Class"),[1] Plaintiffs spent uncompensated time after meal breaks and the end of shifts having their personal bags and Apple technology checked by Apple Managers and Store Leaders (collectively, unless otherwise indicated, the "Checks.")   Apple Employees went through these uncompensated Checks not because they wanted to, but because Apple has a written policy that "all" employees "must" have their bags searched and personal technology checked "every time" they leave a store.

Since filing this action in July 2013, Plaintiffs and Apple have developed a substantial record for the Court's review, consisting of Apple e-mails and policy documents; responses to requests for admissions and interrogatories; employee and management deposition transcripts; Declarations from Apple Employees submitted on behalf of Plaintiffs (the "Employee Declarations"); and Declarations from Apple Store Leaders and Managers submitted on behalf of Apple (the "Manager Declarations.")  This comprehensive record reveals that: (i) Checks of Apple Employees are conducted pursuant to Apple's written policy; (ii) many Apple Employees bring bags and Apple technology to California Stores and go through Checks without compensation; (iii) Checks of Apple Employees have occurred at every California Store during the Class Period; (iv) members of Apple's senior management know about the Checks and have received complaints about them; and (vi) Apple has the technological ability to record the time Apple Employees take to go through Checks.

The record also suggests, however, that there is "inconsistency" and "randomness" regarding the Checks, words Apple has intoned throughout the litigation.  For example: (i) not

---

[1]   The "Class" consists of all current and former hourly paid and non-exempt employees of Apple, Inc. who worked at one or more Apple California retail stores from July 25th, 2009 to the present, including Specialists, Lead Specialists, Expert Specialists, Managers, Senior Managers, Developmental Managers, Business Managers, and Genius Bar Employees.

1

every Apple Employee brings a bag or Apple product to work every day; (ii) not every Apple Employee goes through a Check each time he or she exits a California Store; (iii) there are times when some California Stores do not conduct checks; and (iv) the Checks sometimes take less than a minute in duration and sometime more.   Thus, while there are many common questions applicable to every Apple Employee regarding the Check policy, there are also individual questions about when and how often Apple Employees go through Checks.

Fortunately, the Federal Rules of Civil Procedure have procedural mechanisms to address precisely these circumstances, where employees have a forum to seek unpaid compensation for work they perform for their employer's benefit, and employers are not given a "free pass" for policies they adopt but "randomly" and "inconsistently" apply.  Specifically, Federal Rule 23(c)(4) permits Courts to certify "particular issues" that are common to all members of a proposed class, and Federal Rule 53 permits Courts to appoint special masters to adjudicate remaining class member issues relating to liability and damages.

These are exactly the mechanisms Plaintiffs propose here, which are well-suited to the particular circumstances of this case.  As set forth in Plaintiffs' proposed Trial Plan, Plaintiffs ask the Court to certify under Federal Rule 23(c)(4) the factual and legal questions applicable to every Apple Employee, including: (i) the existence and terms of Apple's Check policy; (ii) Apple's liability for subjecting Apple Employees to Checks at California Stores; (iii) Apple management's actual or constructive knowledge that Apple Employees go through Checks without getting paid; and (iv) the application and scope of Apple's *de minimis* defense regarding the Checks ("Phase One.")   The Court will then hold a trial to address these common issues and proceed to "Phase Two" if Plaintiffs prevail, where Plaintiffs will request appointment of special masters to adjudicate the individual claims of Apple Employees who seek compensation for the time spent going through Checks at California Stores.  It is during this second phase that Apple can raise the "individual" issues it has highlighted throughout this proceeding, including that some California Stores have "break rooms" and some do not; some stores have security guards that perform Checks and some do not; and some Apple Employees have bags and go through Checks and some do not.

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

In utilizing this phased approach under Federal Rules 23(c)(4) and 53, the Court and Apple Employees will not have to relitigate over and over the common factual and legal issues associated with the Check policy, and Apple will retain its due process rights to contest the individual claims of Apple Employees who wish to participate in Phase Two of the litigation.  This approach is substantively fair to Apple and Apple Employees; the most cost-effective mechanism for redressing wage claims of individuals subject to an "inconsistently" applied corporate policy; and endorsed by the Federal Rules and Courts in this and other Circuits.  In these circumstances, and because the other requirements for class certification are satisfied here as demonstrated below, Plaintiffs request that their motion for certification under Federal Rule 23(c)(4) be granted.

## **STATEMENT OF FACTS**[2]

### A.   **Apple's Check Policy Is A Uniform Written Policy**

Since at least 2007 (Ex. 1 at 33), all Apple Employees at all California Stores have been subject to a written policy requiring their bags and Apple products to be checked every time they exit a store (collectively, unless otherwise indicated, the "Check Policy.")  The applicable page of Apple's Check Policy, which "appl[ies] to all employees of Apple Inc…", provides as follows:

> All employees, including managers and Market Support employees, are subject to personal package and bag searches. Personal technology must be verified against your Personal Technology Card (see section in this document) during all bag searches. Ex. 2.

The technology card policy requires Apple Employees to record all their Apple technology on a personal technology card, including the descriptions and serial numbers of the product.  Ex. 3 [9679].  Every time an Apple Employee leaves a store "███████," he or she "m███████████████████████████████████████████████████ ███████" *Id.*

---

[2]      References to exhibits are denoted as "Ex. __ [bates number]."  References to deposition transcripts are denoted as "Ex.__ at (page number)."  References to Declarations are denoted as "Ex.__ ¶__."  All exhibits are attached to the Declaration of Lee S. Shalov dated May 11, 2015 (the "Shalov Dec." or the "Shalov Declaration.")

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

**B.**     **The Necessity Of Bringing Bags And Phones To Work**

Apple Employees bring bags to work to hold a variety of items, including those required by Apple. For example, Apple requires Apple Employees to wear "█████████████" at its stores, which "███████████████████████." Ex. 4 [5490]. Apple also requires Apple Employees to wear an "█████████████" with the employee's name or "appropriate nickname." *Id.* Many Apple Employees place these Apple-required items in bags when they travel to work,[3] and Apple's own Declarations confirm that Apple Employees routinely carry their Apple t-shirts in bags.[4] Notably, employees are not permitted to wear their shirts and lanyards outside the store. Ex. 5 at 134.

In addition to their required shirts and lanyards, Apple Employees bring bags to work to store medications[5]; wallets, computers and iPhones[6]; makeup bags and feminine hygiene products[7]; schoolbooks[8]; and food.[9] Indeed, the videos of four stores analyzed by Apple's purported "expert," Dr. Randolph Hall, revealed that over 60% of woman employees at these California Stores exited with a bag. *See* Ex. 116.

Apple knows employees bring bags to work to store these and other items. As one senior manager wrote: "███████████████████████████████████

---

[3]   Ex. 5 at 134 ("Q. Do you ever see employees take their Apple required shirts in their bags to and from work? A. Sure."); Ex. 6 ¶ 4 ("I would use my backpack or cooler to carry my Apple t-shirt or lanyard which Apple required all retail employees to wear while at work and we were not supposed to wear these items outside the store); Ex. 7 ¶ 5 ("I would also carry in my purse or bag my lanyard, which [were] required by Apple."); Ex. 8 ¶ 7 ("when I brought my bag with me to work, I would often carry my Apple t-shirt and lanyard in my bag.")

[4]   Ex. 9 ¶ 5; Ex. 10 ¶ 9; Ex. 11 ¶ 7.

[5]   Ex. 12 [9800] ("████████████████████████████████"); Ex. 13 ¶ 3 ("My purse or backpack was also necessary to carry personal medication which I could not fit into my pocket and which I needed to have close by at all times."); Ex. 14 ¶ 3 ("I used my purse to carry…medication."); Ex. 15 ¶ 3 (same); Ex. 16 ¶ 4 (same); Ex. 17 ¶ 4 (same); Ex. 18 ¶ 4 (same); Ex. 7 ¶ 4 (same); Ex. 19 ¶ 4 (same); Ex. 20 ¶ 3 (same).

[6]   Ex. 21 at 29; Ex. 22 ¶ 3; Ex. 17 ¶ 4; Ex. 20 ¶ 3; Ex. 23 ¶ 7.

[7]   Ex. 5 at 139; Ex. 20 ¶¶ 3, 8 ("I couldn't leave my belongings in my car, especially if I needed something right away like medication or feminine hygiene products." "I know from discussions with my female colleagues that nearly all of them carried essential and necessary items like feminine hygiene products and medication on a daily basis."); *see also* Ex. 14 ¶¶ 3, 8; Ex. 16 ¶ 4; Ex. 13 ¶ 3; Ex. 15 ¶¶ 3, 8; Ex. 7 ¶ 4; Ex. 19 ¶ 4; Ex. 24 ¶ 3; Ex. 20 ¶ 3.

[8]   Ex. 22 ¶ 3 ("During the time I worked at Apple I was also a student and would need to bring my backpack with me to work nearly everyday to carry my school books and laptop computer."); *see also* Ex. 17 ¶ 4; Ex. 13 ¶ 4; Ex. 14 ¶ 3; Ex. 25 ¶ 6; Ex. 19 ¶ 3; Ex. 26 ¶ 3.

[9]   Ex. 6 ¶ 4 ("I brought a lunch cooler/bag with me nearly every day I worked for Apple…because…I couldn't afford to waste money every day by buying lunch."); Ex. 22 ¶ 3 (I…brought my lunch with me in my bag so I wouldn't be forced to spend excess money each day to purchase my meals."); *see also* Ex. 23. ¶ 7; Ex. 27 ¶ 7.

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

1  ████████████████████████████████████.”  Ex. 28 [41438].  Another Apple executive

2  admitted that a bag is a "necessity of life" for some individuals (Ex. 29 at 147), as is a phone for

3  emergencies.  Ex. 5 at 140.[10]  Apple even provides lockers for employees to place their bags,

4  which they must remove and "████████" at the "████████████." Ex.30 [5495].

5     Estimates of the number of Apple Employees who bring bags and Apple products to work

6  vary.  In the Employee Declarations, employees observed that "[a]lmost all of the employees at my

7  store brought bags with them to work and had at least one piece of Apple technology" (Ex. 14 ¶ 9);

8  "nearly all [employees at my store] brought a bag, purse or both and had to go through a security

9  check when they left the store" (Ex. ¶ 6); "the large majority of employees at my store" brought

10  bags and Apple technology to work (Ex. 7 ¶ 5); "[m]ost all woman brought a bag or purse with

11  them to work … and almost every employee I worked with brought a bag to work" (*Id.* ¶ 6); and

12  "[l]ike me, most Apple employees brought bags and Apple technology to work with them nearly

13  every day… Ex. 31 ¶ 9.

14     In contrast, Apple witnesses say fewer employees bring bags and phones to work.

15  According to some Manager Declarations, "I estimate that about 55-60% of store employees don't

16  bring any bag at all to work…" (Ex. 32 ¶ 51); "I would estimate that less than 50% of employees

17  bring bags in to work" (Ex. 33 ¶ 27); and "I estimate that 30-40% of employees in the Fashion

18  Island store bring a bag to work on any given day." Ex. 34 ¶ 11.[11]

19

20

21

22  _____

23  [10]     The Supreme Court itself recently observed that cell phones "are now such a pervasive and consistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley v. California*, 134 S.Ct. 2473, 2484 (2014).  Likewise, in denying summary judgment to Apple last year, this

24  Court observed that "Apple employees may need to bring a bag to work for reasons they cannot control, such as the need for medication, feminine hygiene products, or disability accommodations."  *Frlekin v. Apple, Inc.*, 2014 WL

25  2451598 at *4 (N.D. Cal. Sept. 5, 2014)
[11]     There are several Store Leaders whose estimates differ materially from the majority of Apple's witnesses.

26  For example, Store Leader Tyrone Miles estimated that "about 20% of the employees at the [Higuera store] <u>don't</u> bring any bag at all to work" (Ex. 35 ¶ 22 [emphasis added]), meaning that approximately 80% do.  Similarly, Store

27  Leader Casey Shull estimated that "about 90% of employees bring bags to work at the Mission Viejo Store."  Ex. 60 ¶ 1.  Why 80% to 90% of employees at some California Stores bring bags to work -- while only 30-40% of employees at

28  other stores bring bags to work -- Apple has not explained.

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

C.      **Apple Directs Managers To Consistently Enforce The Check Policy**

Apple proclaims in the Manager Declarations that store leaders have "discretion" to enforce the Check Policy as they see fit,[12] with one store manager actually calling the policy "voluntary" and "a nice thing to do." Ex. 21 at 39. The written record belies these assertions.

In multiple corporate documents, Apple management mandates strict compliance with the Check Policy.   One corporate document entitled "Internal Theft" warns managers not to "circumvent or take shortcuts regarding policies and procedures"; "[a]dhere to all store key policies"; and "[c]onsistently conduct personal property checks."   Ex. 36 [2668-69] (emphasis added); *see also* Ex. 37 [4013] ("███████████████████████████████████████.") Likewise, e-mails and memos are routinely sent to Apple Employees stressing the need for consistency in enforcing the Check Policy.  *See, e.g.*, Ex. 38 [11434] ("██████████████████ ████████████" [emphasis added])[13] Apple Employees are also sent "████████████" reminders that "████████████████████████████████████████████" Ex. 49 [9681]. And when asked whether "Apple has advised managers that the employee package and bag search policy is a discretionary policy," Apple's corporate representative conceded that "[w]e have <u>not</u> written that this is discretionary, <u>no</u>." Ex. 1 at 93 (emphasis added).

In fact, Apple warns employees that "[f]ailure to comply with [the Check] policy may lead to disciplinary action, up to and including termination." Ex. 2 [2398].  Thus, Apple Employees

---

[12]     *See, e.g.*, Ex. 33 ¶ 20 ("As the Store Leader, it's within my discretion how and whether to apply and enforce the bag check and personal technology check policies."); Ex. 34 ¶ 10 ("As the Store Leader, Apple gives me the discretion and authority not to follow the bag and personal technology check policies."); Ex. 35 ¶ 43 ("I have discretion on how strictly to enforce the bag check and personal technology check policies.")

[13]     *See also* Ex. 39 [44633] ("████████████████████████████████████████████████████ ████████████████" [emphasis added]); Ex. 40 [4337] ("████████ ████████████████████████" [emphasis added]); Ex. 41[4352] ("████████████████████████████ ████████████" [emphasis added]); Ex. 42 [9160] ("████ ████████████████████████████████████" [emphasis added]); Ex. 43 [39071] ("██████ ████████████" [emphasis added]); Ex. 44 [41438] ("████████████████████████████████ ████████████" [emphasis added]); Ex. 45 [45832] ("W ██████████████████████████████" [emphasis added]); Ex. 46 [45903] ("█████████ ██████████████" [emphasis added]); Ex. 47 [15498] ("████████████████████████████████████" [emphasis added]); Ex. 48 [3259] ("████████████████████████████████████████████████████" )

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

who failed to comply with the Check Policy have been forced to attend "████████████" (Ex. 50 [44469]); been cited for "████████████████" (Ex. 51 [50061]); and been subject to a "████████████" Ex. 52 [12842].  One employee who complained about Checks was bluntly told: "█████████████████████████████████████."  Ex. 53 [27927].[14]  Monkowski similarly testified that employees do not have the right to decide if they want to comply with the Check Policy.  Ex. 1 at 100-01.

**D.**   **Every California Store Has Conducted Checks**

There are 52 California Stores at issue in this case.  Apple admits that every one of these stores has conducted bag searches "for at least some part of the limitations period."[15]  Apple also admits that every California Store has conducted technology checks "for at least some part of the limitations period."[16] *See also* Ex. 56.

Plaintiffs produced a total of 27 Employee Declarations from employees who worked at 28 California Stores.  Of those Declarations, every employee said Checks were conducted at every California Store he or she worked at.  *See* Ex. 56.

In addition, Apple produced a total of 20 Store Leader and Manager Declarations from 17 California Stores.  Of those Declarations, 18 out of 20 admitted that Checks were conducted during some period at their California Stores.  Ex. 56.

Further, Apple produced a class list identifying 12,426 Apple Employees who were subject to the Check Policy during the Class Period.  Shalov Declaration ¶ 4.  In the more than 18 months since this action was commenced, and after producing thousands of pages of documents; taking multiple employee depositions; and interviewing scores of Store Leaders, Managers and hourly-paid employees, Apple was able to identify only ten individuals who never went through a bag check during the Class Period.[17]  This equates to a mere 0.0008% of all members of the Class.[18]

---

[14]    *See also* Ex. 54 [44007-08] (identifying Personal Technology Card policy as one of several "███████████," and that "███████████████████████████████" [emphasis in original])
[15]    *See* Ex. 55 (Response to Interrogatory No. 9, Exhibit A)
[16]    *See* Ex. 55 (Response to Interrogatory No. 9, Exhibit B)
[17]    *See* Ex. 57 (Response to Interrogatory No. 12)
[18]    In opposing Plaintiffs' motion for conditional certification under the FLSA, Apple proclaimed that Plaintiffs' motion was "supported by only nine declarations, representing a startlingly low .0002% of the putative class."

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

### E.     The Frequency Of Checks Conducted At California Stores

Estimates of the frequency with which Checks are conducted vary between the Employee Declarations and the Manager Declarations.   As Apple Employees stated in the Employee Declarations: "[b]efore the installation of the off-site break room I had my bag checked at least 70% of the time I left the store at the end of my shift" (Ex. 58 ¶ 6); "[w]hen I left the store at the end of my shift, I would be subject to a security check 100% of the time" (Ex. 14 ¶ 8); "[t]hese checks of my personal technology occurred over 75% of the time before I was allowed to leave the store" (Ex. 22 ¶ 6); "I was subject to some form of security check (bag, technology or both) 100% of the time when I left the store at the end of my shift" (Ex. 59 ¶ 6); and Ex. 15 ¶ 6 (same). Adherence to the Check Policy is also confirmed in Manager e-mails. *See* Ex. 164 [9713-14] ("█████████████████████████████████████")

In contrast, the Managers and Store Leaders represent that Checks take place less frequently.  According to the Manager Declarations: "… I  and other managers conducted virtually no bag checks at all" (Ex. 60. ¶ 11); "[o]ut of employees who leave with bags, I estimate that less than 20% get back checks" (Ex. 61 ¶ 30); "[d]uring that period, only about 30-40% of employees who left the store with bags had their bags checked" (Ex. 62 ¶ 21[19]); "95% of employees with bags leave the store without undergoing any type of check" (Ex. 32 ¶ 21); and "I estimate that during the past year, about 40% of the employees who bring bags to work have their bag checked when they leave." Ex. 63 ¶ 23.

### F.     Employees Wait For Checks To Be Conducted

Bag checks and technology checks are performed at the same time.  Ex. 1 at 65.  The procedures for conducting Checks are described in corporate documents published on Apple communication platforms.  *See, e.g.*, Ex. 64.  Among other things, managers are instructed to: (i) "open every bag, brief case, back pack, purse, etc…"; (ii) "remove any type of item Apple may

---

According to Apple, "[t]he dearth of Plaintiffs' evidence speaks volumes."  *See* pg. 1, Apple Opposition to Plaintiffs' motion for collective certification dated December 23, 2013.

[19] This statement contradicts an email received by Apple Store Leader, Barbara Davis from her "[t]eam" member, Shelly Reid in which Ms. Reid stated "█████████████████████" Ex. 160 [15197] (emphasis added.)

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

sell…"; (iii) "verify the serial number of the employee's personal technology against the personal technology log"; (iv) "[v]isually inspect the inside of the bag and view its contents"; and (v) have the employee remove any "questionable" item from the bag. *Id.*

In addition to the time spent in the actual Check, Apple Employees wait for Checks to be conducted. These waits are caused by a variety of factors, including searching for a store manager to conduct a Check; waiting for the manager to finish assisting a customer; waiting in line for a Check to be performed; the absence of a guard to conduct the Check; and the actual performance of the Check.[20] Apple management is aware of these waiting times as internal e-mails confirm.[21] Similarly, Store Leaders in the Manager Declarations acknowledge there are sometimes lines and waiting times associated with the Checks.[22]

The duration of the Check process varies as between the Employee Declarations and the Manager Declarations. In the Employee Declarations, estimates of uncompensated wait times include 10-15 minutes per day (Ex. 14 ¶ 8); 10 minutes per day (Ex. 22 ¶ 7); 10 minutes per day to as high as 20 minutes during product launches and holidays (Ex. 6 ¶ 11); 5-10 minutes per day (Ex. 7 ¶ 5); 5-10 minutes per day (Ex. 31 ¶ 7); 5-10 minutes per day (Ex. 8 ¶ 4); 10 minutes per day (Ex. 58 ¶ 5); 5-10 minutes per day (Ex. 68 ¶ 6); and 5-10 minutes per day. Ex. 17 ¶ 6.

In contrast, the Manager Declarations minimize the length of the Checks. Apple witnesses proclaim that "[i]t's a quick visual check of the inside of the bag, and the process takes at most 5

---

[20]   *See* Ex. 14 ¶ 6 ("The security checks were time consuming because after I clocked out, I would have to search around the store for a manager [who was often busy helping customers or performing other tasks.]"); Ex. 22 ¶ 7 ("The time spent looking for or waiting for a manger and then waiting in line for other employees to finish their security checks took up the bulk of the time."); Ex 31 ¶ 5 ("Many times I had to wait for the manager to finish completing whatever task they were doing and then have my bags and personal technology checked before I was allowed to leave the store. There were often lines of employees waiting to undergo a security check, especially at the end of the day and at the end of a shift."); Ex. 15 ¶ 7 ("I would often have to wait for a manager to finish helping a customer or performing some other task before undergoing the required security check."); Ex. 17 ¶ 6 ("If a manager was helping a customer or performing some other task, I was forced to wait for them to be available to conduct the security check.")
[21]   *See, e.g.*, Ex. 65 [5062] (

); Ex. 44 [41439] ("                                                                              ")
        *See, e.g.*, Ex. 32 ¶ 41 ("On rare occasions, I have seen one or two employee hover around a manger who is talking to a customer, waiting for the manager to become available to check their bags."); Ex. 66 ¶ 41 ("The only reason I've seen an employee not be able to get a bag or personal technology check immediately is because the employee approached a manager who was in the middle of talking to a customer and waited for the manager to check the bag"); Ex. 67 ¶ 53 ("I've never seen any employees at the store wait around for a manager to conduct a bag or personal Apple technology check for anything longer than a minute.")

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

seconds" (Ex. 33 ¶ 24); "[t]hose bag checks that I observed took only a few seconds" (Ex. 34 ¶ 8); "[t]he entire process takes 10 seconds, at most" (Ex. 35 ¶ 26); "[t]he bag checks were quick, and lasted only a few seconds" (Ex. 60 ¶ 12); "[t]he bag check process once I clocked out would take less than a minute to complete" (Ex. 69 ¶ 14); "[t]he checks only took a few seconds" (Ex. 61 ¶ 35); and "[t]he check took 30 seconds at most.  It usually took less time than that." Ex. 62 ¶ 31.

## G.   <u>Apple Does Not Compensate Many Apple Employees For Checks</u>

According to many Employee Declarations, Checks occur off-the-clock and, thus, are not compensated.[23]   Apple itself admits that "at times, some employees were not compensated for undergoing technology checks."[24]

Moreover, Apple does not have a written policy about compensating employees who go through Checks.  Ex. 1 at 85.   However, Apple does not consider the time undergoing Checks -- even though required by Apple pursuant to its written policy -- to be compensable "work."  *Id.* at 86.  Thus, Apple has never informed employees they may be compensated for the time they spend going through Checks, regardless of the duration of the Checks and their accompanying wait time. *Id.* at 89.[25]   As one of many employees observed, "I did not know at the time that I worked for Apple that time spent waiting and undergoing security checks may be compensable."  Ex. 58 ¶ 8.[26] "Had I known this I certainly would have asked to be compensated for this time."  *Id.*

---

[23]     *See, e.g.*, Ex. 14 ¶ 5 ("The security checks always occurred off-the-clock."); Ex. 13 ¶ 9 ("I was always off the clock during these security checks and was never paid for any of this time.); Ex. 7 ¶ 5 ("These security checks…always occurred after I clocked out."); Ex. 25 ¶ 4 ("I was never allowed to nor did I go through a security check and then clock out at either store I worked at."); Ex. 70 ¶ 5 ("The security checks that occurred at meal breaks and at the end of my shift were always done off-the-clock, after I had already clocked out.")
[24]     Ex. 71 (Response to Request for Admission No. 25)
[25]     Apple's written "Time and Attendance" policy for hourly employees provides that "[a]ll time worked is considered 'on the clock.'  'Time worked' incudes any time that is spent directly performing a function for a specific job at Apple."  Ex. 72 [2585].
[26]     *See also* Ex. 22 ¶ 8.

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

**H.   Employees Have Complained To Apple Management About Checks**

Apple executives know employees complain about the Check Policy.  One employee wrote Chief Executive Officer Timothy Cook ("Cook") about the Checks, which treat employees as "████" and is "████," "████" and "████." Ex. 73 [5607-08].  Cook responded to his management team by asking: "████" *Id.* Another employee wrote Cook and other Apple executives: "███████████████████████████████████████ ████████████████████████████████████" Ex. 74 [7153] [sic].[27]  Still another employee complained that the Checks "███████████████████████████████████████████████" and that Apple was "███████████████████████" Ex. 76 [27297].[28]  One store manager even asked whether "███████████████████████████████████████ ███████████████████" Ex. 77 [3539].  These and other complaints led some senior members of Apple management to voice their discontent with the Check Policy. *See, e.g.,* Ex. 74 [7152] ("████████████████████████████████████████████████ ███████████████████████████████"}

**I.   The Check Policy Is For Apple's Benefit**

Apple created the Check Policy for its own benefit and not the benefit of Apple Employees. Specifically, Checks are conducted to reduce employee theft at retail stores, a phenomenon called "████" Ex. 118 at 29.  As opt-in employee Claudia Wright explained:

████████████████████████████████████████████████████████████

---

[27]   *See also* Ex. 75 [11150] ("████████████████████████████████████████████████ ████

Another employee stated that "[m]any employees, including myself, complained about the uncompensated security searches to managers and supervisors during daily store meetings … Employees, including myself, who complained about uncompensated security checks, had their complaints ignored and we were told that the off-the-clock security check process was simply Apple's policy." Ex. 6 ¶ 11.; *see also* Ex. 148 [12077] ("████████████████████████████████████████████ ████") (emphasis added).

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

Ex. 47 [00015498].  *See also* Ex. 118 at 55 (Acknowledging that bag checks "▮▮▮▮" benefit

Apple because "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Ex. 21 at 20 (bag check policy

"ensure[s] that no product that hasn't been purchased by the employee is taken.")

## J.   **Apple Can Easily Record Waiting Time For Checks**

Apple Employees have the ability to clock in and out on a portable "EasyPay device."  Ex.

78 at 51.  The process is a "simple" one where an employee types in an employee number and then

punches "in" or "out."  *Id*. at 52.  According to Vice President Steve Cano ("Cano") in describing a

demonstration of the feature: "it seemed like less than two seconds or three seconds to clock in and

out."  *Id*. at 53.

Apple Employees can clock in or out with an EasyPay device anywhere in the store.  *Id*. at

53, 54.  Thus, an Apple Employee can have a Check performed first and then clock out using an

EasyPay device (*id*. at 55-56), thereby allowing the employee to be compensated for the Check.

Sometimes Apple Store Leaders place EasyPay devices at the front of stores to allow employees to

clock out after their Checks have been performed and thereby be paid for the wait.  *See, e.g.*, Ex.

63 ¶ 35 ("after the meetings [with all store employees], we had a cart with EasyPays stationed at

store exit so that employees used the EasyPays to clock out as they left.")[29]  However, some Apple

Employees were instructed not to clock out on the EasyPay devices but rather "clock[] out in the

back of the store and then…find and wait for a manager and then undergo a security check while

off-the-clock."  Ex. 17 ¶ 8; *see also* Ex. 81 ¶ 8 ("Apple has the ability to have employees go

through a security search and then clock out on an EZ-Pay device but Apple employees at my store

were instructed to clock out in the back of the store and then find a manager to perform the

security check off-the-clock.")

Alternatively, a store manager can manually adjust an Apple Employee's timecard in

Apple's software program.  Ex. 21 at 46; Ex. 82 at 75.  Apple's Time and Attendance software, at

---

[29]    *See also* Ex. 79 ¶ 10 ("When I am done with my shift, I will grab my things from my locker…clock out on an
EasyPay device, set it in the charger, and then walk out of the store."); Ex 80. ¶ 6 (same); Ex. 37 ¶ 4 (same).

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

least through November 2012, recorded time in one minute increments.  *Id*. at 46, 47.  Thus, one store manager added as little as one minute of compensable time to an employee who waited for a manager to arrive at a store.  Ex. 21 at 46, 47.

## ARGUMENT

## I.   CERTIFICATION IS APPROPRIATE UNDER FEDERAL RULE 23(c)(4)

Courts regularly certify "particular issues" using the procedures available under Federal Rule 23(c)(4).[30]  As explained by the Court in *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 800 (7th Cir. 2013), "a class action limited to determining liability on a class-wide basis, with separate hearings to determine -- if liability is established -- the damages of individual class members … is permitted by Rule 23(c)(4) and will often be the sensible way to proceed."

The Seventh Circuit in *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012) (emphasis added), explained the rationale of Federal Rule 23(c)(4) in an action where individual determinations in separate proceedings were required:

> Each class member would have to prove that his compensation had been adversely affected by the corporate policies, and by how much.  So should the claim of disparate impact prevail in the class-wide proceeding, hundreds of separate trials may be necessary to determine which class members were actually adversely affected by one or both of the practices and if so what loss each class member sustained—and remember that the class has 700 members.  But at least it wouldn't be necessary in each of those trials to determine whether the challenged practices were unlawful.  Rule 23(c)(4) provides that 'when appropriate, an action may be brought or maintained as a class action with respect to particular issues.[31]

Wage-and-hour class actions are particularly well-suited for certification under Federal Rule 23(c)(4) when an employee's injury-in-fact and individual damages must be adjudicated in separate proceedings.  Among other things, questions concerning an employer's policies and liability for those policies "would further the goals of efficiency and uniformity in decision-making

---

[30]   *See, e.g., Lilly v. Jamba Juice Co.*, 2014 WL 4652283 at *11 (N.D. Cal., Sept. 18, 2014) ("[T]he Court will exercise its discretion pursuant to Rule 23(c)(4) of the Federal Rules of Civil Procedure to certify the proposed class solely for purposes of determining liability.")

[31]   In the Ninth Circuit, a class may be certified as to particular issues concerning liability even if the claim as a whole does not meet the predominance requirement of Federal Rule 23(b)(3).  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

13

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

that underlie Rule 23." *Jacks v. DirectSat USA, LLC*, 2015 WL 1087897 at *7 (N.D. Ill., March 10, 2015)   Moreover, "[h]olding a single proceeding to resolve the common issues 'in one stroke'…would be most efficient and materially advance the litigation because subsequent courts would be spared from having to adjudicate the common issues 'anew in each case.'" *Id.* (citations omitted)[32]

Citing Federal Rule 23(c)(4), this Court approved a bifurcated approach in *Cherry v. City College of San Francisco*, 2005 WL 6769124 (N.D. Cal. 2005), a proposed class action where students alleged that college campuses were not sufficiently accessible to persons with disabilities. In that case, the Court identified ten common questions that applied to members of the class, including questions regarding the college's policies and liability under applicable regulations.  *Id.* at *6.  The Court then ruled that "the issue of individual damages should be left to each student to assert as he or she wishes in subsequent proceedings, including separate lawsuits." *Id.*

Applied here, resolution of the common issues identified below would materially advance the disposition of this litigation, making Federal Rule 23(c)(4) particularly appropriate.  In a single proceeding, this Court can address a host of core issues applicable to every Apple Employee who went through a Check at a California Store, including: (i) whether Apple had a uniform policy regarding Checks that applied to Apple Employees; (ii) whether Apple management knew or should have known that Apple Employees went through uncompensated Checks at California Stores; (iii) whether Apple is obligated under California law to compensate Apple Employees who went through Checks; and (iv) whether Apple has valid defenses based on the statute of limitations and the *de minimis* doctrine.

---

[32]     *See also In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005) ("This is not to say that the case is unsuitable for class treatment…A single hearing may be all that's necessary to determine whether Allstate had a policy of forcing its employee agents to quit. This issue could be decided first and then individual hearings conducted to determine which of the members of the class were actually affected by the policy rather than having decided to quit for their own reasons. Fed.R.Civ.P. 23(c)(4)(A). That would be a more efficient procedure than litigating the class-wide issue of Allstate's policy anew in more than a thousand separate lawsuits."); *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 593 (S.D.N.Y. 2013) ("DR's misclassification, if proved, will have necessarily caused a uniform type of injury to class members: namely, the lack of overtime to which all class members would be entitled. The only remaining question then will be how much each individual is owed -- an inquiry that may require varying levels of individualized proof for the reasons discussed above. Accordingly, this instance is one in which the certification of the liability class [under Federal Rule 23(c)(4)] is particularly appropriate.")

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

The specific legal and factual questions that are common to Apple Employees and as to which Plaintiffs request certification are set forth in Section IIC(2) below.  Without certification, these issues would need to be litigated over and over in separate lawsuits, an extraordinarily inefficient and costly outcome that could well deter many Apple Employees from seeking compensation for the time spent complying with Apple's Check Policy.  In contrast, a single proceeding adjudicating these questions will achieve economies of time and expense and promote uniformity of decisions for each member of the Class.  In light of these well-recognized benefits, certification under Federal Rule 23(c)(4) is warranted.

## II.   THE REQUIREMENTS OF FEDERAL RULE 23(a) ARE SATISIFIED

### A.   The Class Is Ascertainable

"As a threshold matter, and apart from the explicit requirements of Federal Rule 23(a), the party seeking class certification must demonstrate that an identifiable and ascertainable class exists." *Quezada v. Con-Way Freight, Inc.*, 2012 WL 4901423 at *2 (N.D. Cal. Oct. 15, 2012)  A class definition is sufficient if the description of the class is "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member."  *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998).  However, "the class need not be so ascertainable that every potential member can be identified at the commencement of the action." *Id*.

Here, the Class consists of Apple Employees who worked in a California Store during the Class Period.  No individual inquiry is necessary to identify these individuals as their names and addresses are retrievable from Apple's records.  In fact, Apple has already produced to Plaintiffs'

15

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

Counsel a list identifying the contact information for all members of the Class. Accordingly, the Class is readily identifiable and ascertainable.[33]

## B.     The Numerosity Requirement Is Satisfied

For purposes of Federal Rule 23(a)(1), "courts generally find that the numerosity factor is satisfied if the class comprises 40 or more members." *In re Facebook Inc., PPC Advertising Litig.*, 282 F.R.D. 446, 452 (N.D.Cal. 2012). Here, according to the class list produced by Apple, there were 12,426 Apple Employees from July 25, 2009 through September 17, 2014. *See* Shalov Dec. ¶ 4. Moreover, based on: (i) Defendant's acknowledgement that every California Store conducted Checks (Ex. 55 [Response to Interrogatory No. 9, Exhibits A, B]); (ii) the Manager Declarations admitting that multiple Apple Employees went through Checks (s*ee* Ex. 56); and (iii) the Employee Declarations confirming that multiple Apple Employees went through Checks (*id.*), a fair inference can be drawn that hundreds -- if not thousands -- of Apple Employees went through Checks during the Class Period. Thus, the numerosity requirement is satisfied.

## C.     The Commonality Requirement Is Satisfied

"[F]or purposes of Rule 23(a)(2) [e]ven a single [common] question will do." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2556 (2011). The common contention "must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at 2551.

### 1.     The Legal Framework For Plaintiffs' Claims And Apple's Defenses

The claims asserted in Plaintiffs' Consolidated Complaint arise under the California Labor Code, relevant Wage Orders of the Industrial Welfare Commission ("IWC"), and California's

---

[33]     The fact that some Apple Employees did not go through Checks -- and, thus, may not be able to recover -- does not undermine a finding of ascertainability. *See, e.g., Akaosugi v. Benihana National Corp.*, 282 F.R.D. 241, 255 (N.D. Cal. March 30, 2012) ("Defendant further contends that the class may include individuals who did not forfeit vacation pay upon termination. This is not a basis to deny certification."); *Lilly v. Jamba Juice Co.*, 2014 WL 4652283 at *3 (N.D. Cal., Sept. 18, 2014); *Mateo v. M/S Kiso*, 805 F.Supp. 761, 773 (N.D. Cal. 1992) ("[w]hen rejecting class certification based on overbreadth … the problem lies in the court's ability to ascertain the class, not whether the putative class members have [each] been aggrieved.")

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

Unfair Competition Law.[34]  Whether time is compensable under these statutes and Wage Orders is determined by the level of control exerted by the employer over the employee.  *See Morillion v. Royal Packing Co.*, 22 Cal.4th 575, 586 (2000).  In this case, Plaintiffs contend that when Apple Employees wait for and undergo Checks pursuant to Apple's uniform policy, "they are under the control of their employer."  *Cervantez, supra*, 253 F.R.D. at 571.  As such, that time should be compensable under IWC Wage Order No. 4, which defines "hours worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so."  *Id.*  In addition to showing "control," a plaintiff must demonstrate that (1) he or she performed work while under the employer's control, for which (2) he or she did not receive compensation, and of which (3) the employer was aware or should have been aware.  *Ortiz v. CVS Caremark*, 2013 WL 6236743 at *9 (N.D. Cal., Dec. 2, 2013)

Apple has also interposed a number of affirmative defenses that raise factual and legal questions applicable to every Class member.  Specifically, Apple's Second Affirmative Defense is premised on "the applicable statute(s) of limitations, including but not limited to, California Code of Civil Procedure sections 338, 340(a-b) and Business and Professions Code section 17208.  *See* Answer (Dkt. No. 240) pg. 11.  In addition, Apple's Fifth Affirmative Defense is premised on its assertion that the "actions taken in connection with Plaintiffs' and/or the putative class members' compensation were done in good faith and in conformity with and reliance upon written administrative regulations…"  *Id.* pg. 12.  Further, Apple's Tenth Affirmative Defense is premised on its assertion that "[s]ome or all of the hours worked by Plaintiffs and/or the members of the putative class and claimed as unpaid were *de minimis* and do not qualify as compensable hours worked under the California Labor Code and/or any other law."  *Id.*

---

[34]      Specifically, Plaintiffs allege that Apple violated California Labor Code sections 201, 202, 203, 204, 226, 226.7, 510, 512, 1194, 1194.2, 1198, and 2698 et seq., as well as Business & Professions Code section 17200, *et seq.* and IWC Wage Order No. 4.

### 2.  <u>Common Factual and Legal Questions</u>

Based on these claims and defenses, Plaintiffs seek certification under Federal Rule 23(c)(4) of sixteen common questions during Phase One of the litigation that will "resolve an issue that is central to the validity" of the claims of Apple Employees who participate in Phase Two. Specifically: (1) Did Apple have a written policy regarding Checks that applied to Apple Employees at California Stores during the Class Period?; (2) If so, what were the requirements of the policy?; (3) What did Apple tell Apple Employees about how and when the policy should be enforced?; (4) Did Apple give senior-level employees discretion to enforce the Policy, and, if so, under what circumstances? (5) Did Apple conduct Checks of Apple Employees at California Stores pursuant to the policy?; (6) If so, did Apple management know -- or should Apple management have known -- that Apple Employees went through Checks at California Stores during the Class Period?; (7) Did Apple management act in "good faith" and "in conformity with and reliance upon" written administrative orders and other regulations in adopting and enforcing the Check policy?; (8) Did Apple have a policy of compensating Apple Employees who went through Checks at California Stores during the Class Period?; (9) If so, what was the nature of the compensation policy?; (10) If not, how, if at all, were Apple Employees instructed to obtain compensation for Checks?; (11) Did Apple have the technological ability to record the time taken for Apple Employees to go through Checks?; (12) If so, in what time increments did Apple have the technological ability to record the time taken for Apple Employees to go through Checks?; (13) Were Apple Employees who went through Checks subject to Apple's "control" for purposes of imposing liability under California law?; (14) Does the *de minimis* doctrine apply to Checks?; (15) If so, what is the durational scope of the doctrine, if any, as it applies to Checks?; and (16) When did Plaintiffs' and Class members' claims accrue for purposes of Apple's statute of limitations defense?

The resolution of these common questions during Phase One of the litigation will have a direct bearing on the claims of Apple Employees who participate in Phase Two of the litigation. Specifically, Questions One, Two, Three, Four and Thirteen address the question of Apple's liability for Checks conducted of Apple Employees at California Stores pursuant to a company-

wide policy (the "Common Policy Questions.")[35]   Questions Five and Six address Apple's knowledge -- or constructive knowledge -- that Checks were occurring at California Stores during the Class Period (the "Common Knowledge Questions.")[36]   Questions, Eight, Nine and Ten address issues of compensation and the damages Apple Employees can secure during Phase Two of the litigation (the "Common Damages Questions.")  And Questions Eleven, Fourteen, Fifteen and Sixteen address Apple's affirmative defenses based on its purported "good faith" conduct, the statute of limitations and the *de minimis* doctrine (the "Common Defense Questions.")[37]

There will also be common testimonial and documentary proof regarding these questions during Phase One of the litigation.  Specifically:

- **Proof of the Common Policy Questions** will be based on: (i) the testimony of one or more of the named Plaintiffs; (ii) the testimony of Carol Monkowski ("Monkowski"), Apple Senior Director of Field Operations; Paul Benjamin ("Benjamin"), Apple's Director of Loss Prevention; Denise Young-Smith ("Smith"), Apple Vice-President of Worldwide Human Resources; and Steve Cano ("Cano"), Apple Vice-President of Integrated Customer Experience; (iii) Apple corporate documents describing the Check Policy; (iv) Apple corporate documents discussing enforcement of the Check Policy; (v) Apple declarations discussing the purported discretion of Apple Employees to enforce the Check Policy; and (vi) internal Apple e-mails discussing the requirements of the Check Policy.

- **Proof of the Common Knowledge Questions** will be based on: (i) the testimony of Monkowski, Benjamin, Smith and Cano; (ii) e-mails to and from Chief Executive Officer Timothy Cook and other Apple executives regarding Checks conducted of

---

[35]     Questions about an employer's policies and liability for those policies are common questions for purposes of Federal Rule 23.  *See, e.g., Garvey v. Kmart Corp.*, 2012 WL 2945473 at *4 (N.D. Cal. July 18, 2012) ("The common issue is whether Kmart's policy of not providing seats to its cashiers in the Tulare store violates Section 14 because the nature of a Kmart cashier's work reasonably permits the use of seats."); *Cervantez v. Celestica Corp.*, 253 F.R.D. 562, 572 (C.D. Cal. July 30, 2008) ("Plaintiffs have thus established at least one question of law common to all members of the security line class; whether time spent in the security line at the end of a shift is compensable under the California Labor Code.")

[36]     Questions about an employer's knowledge or constructive knowledge regarding wage practices are common questions for purposes of Federal Rule 23.  *See, e.g., Jimenez v. Allstate Insurance Co.*, 2012 WL 1366052 at *20 (C.D. Cal. Apr. 18, 2012) ("With respect to whether Defendant had actual or constructive knowledge of the unpaid overtime, the question of constructive knowledge is amenable to class treatment.")

[37]     Questions regarding the *de minimis* doctrine are common questions for purposes of Federal Rule 23.  *Otsuka v. Polo Ralph Lauren Corp.*, 2010 WL 366653 at *6 (N.D. Cal., Jan. 25, 2010) ("[E]ven if defendants are correct that federal *de minimis* standards apply to plaintiffs' California claims, application of those standards will still require resolution of a number of significant common questions…")  Likewise, a statute of limitations defense raises questions that are common to all members of a class.  *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 486 (C.D. Cal. 2012) ("Plaintiffs' arguments to rebut Defendant's Statute of Limitations defense raise common questions of law and fact that are susceptible to common proof.")

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

Apple Employees; (iii) written complaints about Checks addressed to Apple management; and (iv) Apple's pleadings, responses to interrogatories and responses to requests for admissions.

- **Proof of the Common Damages Questions** will be based on: (i) the testimony of Monkowski; and (ii) Apple corporate documents describing Apple's compensation policies for Apple Employees; and

- **Proof of the Common Defense Questions** will be based on: (i) the testimony of Julie Schmitz (describing the technologies available to Apple employees to record time); (ii) the Declarations of Apple employees, including Margaret Karn, Brandon Ernst and Josh Attwood (describing the use of hand-held devices for Apple employees to record time); (iii) the testimony, if accepted, of Apple's proposed "expert," Dr. Randolph Hall; (iv) Apple corporate documents describing the technologies and procedures available for Apple employees to record time; and (v) the testimony of Monkowski, Benjamin, Smith, Cano and other Apple corporate representatives designated by Apple.

In light of the common questions and proof in this case, the commonality requirement is readily satisfied.  As described above, there are multiple questions that apply to every Apple Employee who went through a Check at a California Store during the Class Period.   Moreover, the answers to these questions are clearly "apt to drive the resolution of the litigation" (*Dukes*, 131 S.Ct. at 2551) because Apple's Check policy, knowledge of the policy, liability for the policy and defenses to the policy will be addressed and resolved in a single proceeding for all members of the Class, which is precisely the efficiency Federal Rule 23 is designed to achieve.[38]

**D.**   **The Typicality Requirement Is Satisfied**

For purposes of Federal Rule 23(a)(3), typicality ensures that "the interests of the named representatives align with the interests of the class."  *Wolin v. Jaguar Land Rover N. Am. LLC*, 617 F.3d 1168 (9th Cir. 2010)  "The test of typicality "is whether others members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same conduct.'"   *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted)

---

[38]  *See Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 625 (S.D. Cal. 2014) (The Court finds the questions of whether the Alleged Policy existed, was enforced on a companywide basis, and resulted in Costco's control over employees satisfied the commonality requirement.")

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

The typicality requirement is readily satisfied here.  Each of the five Plaintiffs were Apple Employees who worked at California Stores.[39]  Each of the five Plaintiffs went through uncompensated Checks during the Class Period.[40]  And each of the five Plaintiffs assert the same claims for relief as other members of the Class.  In these circumstances, the interests of the named Plaintiffs align with those of the Class they seek to represent.

**E.      The Adequacy Requirement Is Satisfied**

"The adequacy of representation requirement … requires that two questions be addressed: (a) do the name plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2008)  Here, neither the Plaintiffs nor their counsel have conflicts with other members of the Class.  Plaintiffs were subject to the same Check Policy as other Apple Employees; went through uncompensated Checks like other Apple Employees, and, therefore, were harmed by the same conduct and assert the same claims for relief.

Moreover, Plaintiffs and their counsel have vigorously prosecuted the action since inception.  For their part, Plaintiffs have regularly communicated with counsel regarding the litigation; produced documents regarding their work for Apple; responded to interrogatories and document requests; executed declarations in support of their claims; and appeared for depositions before Apple's counsel.  *See* Shalov Dec. ¶ 2.  Likewise, Plaintiffs' counsel has actively investigated and prosecuted Plaintiffs' claims.  They have researched and drafted comprehensive pleadings; appeared for Court conferences and hearings; aggressively pursued e-mail and other document discovery from Defendant's counsel; reviewed thousands of pages of documents produced by Apple; defended scores of depositions taken by Apple of Apple Employees; and taken multiple depositions of Apple Store Leaders, Managers and members of Apple management.  *See* Shalov Dec. ¶ 3.  In light of these efforts, the adequacy requirement is readily satisfied in this

---

[39]      *See* Ex. 114 ¶ 2; Ex. 113 ¶ 2; Ex. 115 ¶ 2; Ex. 112 ¶¶ 3-4; Ex. 106 at 42-43.
[40]      *See* Ex. 114 ¶ 6; Ex. 113 ¶ 6; Ex. 115 ¶¶ 6-7; Ex. 112 ¶ 63; Ex. 106 at 182-196.

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

1    case.

2    **III.     PLAINTIFFS' PROPOSED TRIAL PLAN**

3    **A.     Background**

4          Over the years, security inspection and other "off-the-clock" cases have typically been

5    brought under Federal Rule 23(b)(3), which requires a Plaintiff to show that common questions

6    "predominate over any questions affecting only individual members."   In several of these cases,

7    courts have found predominance to be satisfied as long as the employer had a written or *de facto*

8    policy requiring employees to submit to inspections at the employer's facilities.[41]   In these

9    circumstances, individual questions were found to relate principally to damages, which do not

10   preclude certification under controlling authority.  *Id.*[42]

11         In another line of cases, courts held predominance did not exist because individual

12   questions were found to be ones of liability as well as damages, including whether employees

13   actually worked off-the-clock or went through inspections.   In those cases, the courts found

14   insufficient proof that: (i) the individual liability questions could be adjudicated on a class-wide

15   basis[43]; or (ii) there was a workable trial plan for addressing the individual questions.[44]

16

17   ───────────────

     [41]       *See, e.g., Otsuka v. Polo Ralph Lauren Corp.*, 2010 WL 366653 at *6 (N.D. Cal., Jan. 25, 2010) (finding in
18   class action challenging bag searches that "application of the 'control' rule presents a common question of law that can
     be resolved on a class basis, outweighing any individualized inquires that will be required."); *Cervantez v. Celestica*
19   *Corp.*, 253 F.R.D. 562, 577 (C.D. Cal. July 30, 2008) ("Plaintiffs' security line claims hinge on whether such time is
     compensable … Accordingly, this question of law common to the proposed security line class members predominates
20   over any question affecting only individual members…"); *Kurihara v. Best Buy Co., Inc.*, 2007 WL 2501698 at *10
     (N.D. Cal., Aug. 30, 2007) ("Here, plaintiff has provided substantial evidence of the existence of a company-wide
21   policy whereby employees are subject to inspections, and not compensated for the time spent on those inspections.
     This policy forms the bases of the alleged injuries at the center of this action.  Although plaintiff has submitted little or
22   no evidence as to the implementation of that policy, the detailed nature of the policy itself, and the reasonable
     inferences which can be drawn from them, constitute sufficient evidence to satisfy plaintiff's burden as to the
23   predominance of common questions."); *Murphy v. CVS*, No. BC464785, Los Angeles County Superior Court (June 21,
     2013) (granting class certification for California Labor Code claims that class members were not compensated for time
24   spent waiting for security checks after clocking out.) (*See* Plaintiffs' Request For Judicial Notice filed
     contemporaneously herewith.)
     [42]       The Ninth Circuit has held that the presence of individualized damages cannot, by itself, defeat class
25   certification.  *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).   Indeed, the Court specifically observed
     that "[d]amages determinations are individual in nearly all wage-and-hour class actions."  *Id.* at 513-14.
26   [43]       *See Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 629 (S.D. Cal. 2014) (finding that "time-and-motion
     expert opinion" was not "an acceptable form of common proof of *liability*" that employees were locked in warehouses
27   while supervisors performed closing inspections. [emphasis in original])
     [44]       *See Ogiamien v. Nordstrom, Inc.*, 2015 WL 773939 at *5 (C.D. Cal. Feb. 24, 2015) ("Ogiamien fails to offer
     a solution for the large number of proposed class members where no *liability* exists." [emphasis in original])

28

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

**B.     Plaintiffs' Proposed Trial Plan**

With this motion, brought under Federal Rule 23(c)(4) rather than Federal Rule 23(b)(3), Plaintiffs have carefully addressed these predominance-related concerns and advanced a balanced approach sanctioned by the Federal Rules that accommodates the interests of all parties in this action.  Specifically, as set forth in Plaintiffs' proposed 18-page Trial Plan (attached as Ex. 83 to the Shalov Declaration), the action will be litigated in two phases, denoted as Phase One and Phase Two, where common questions will be adjudicated in the first phase of the action and individual questions, such as which Apple Employees went through Checks and for what duration, will be adjudicated in the second phase.  Importantly, Courts in this Circuit have endorsed the concept of a two-phase trial plan -- with individualized hearings to adjudicate damages and other individual issues -- particularly in wage and hour class actions such as this.[45]

**1.     Phase One**

In Phase One of the litigation, notice will be disseminated to Apple Employees to advise them of the litigation and their rights as members of the Class, including their right to request exclusion.  The Court will then hold a trial to adjudicate the common factual and legal issues applicable to Apple Employees who do not opt-out of the Class, including issues of Apple's liability and knowledge.  The common proof offered during Phase One will include internal Apple e-mails, corporate policy memos and guidelines, responses to requests for admissions, and testimony from Apple executives.

The Court can also address during Phase One Apple's *de minimis* defense and other common affirmative defenses, and, if appropriate, adopt guidelines for use during Phase Two of the litigation.  For example, Plaintiffs will offer common proof during Phase One that Apple has the technological ability to record waiting times of Apple Employees in one minute increments.

---

[45]     *See Bowerman v. Field Asset Services, Inc.*, 2015 WL 1321883 at *13 (N.D. Cal., March 24, 2015) ("This is precisely the sort of trial plan that has been approved on numerous occasions in this circuit and elsewhere, both before *Dukes* and after."); and *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 539 (N.D. Cal. 2012) ("Although this case does present individualized questions with respect to any particular class member's entitlement to relief, Plaintiffs' proposed trial plan addresses these concerns by employing the *Teamsters* framework, in which individual class members will present their claims for relief in a second phase of trial if liability is established, and Defendant will have an opportunity to present individualized defenses with respect to each class member.")

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA

Should the Court find that waiting times of less than one minute are *de minimis* as a matter of law, that holding can apply to the individual claim process contemplated under Phase Two of the litigation.

During Phase One, the Court will not need to adjudicate the supposedly "dissimilar" facts associated with California Stores and Apple Employees that Apple has highlighted throughout the litigation.  For example, the different sizes and layouts of California Stores; the presence of off-site break rooms and security guards in some stores and not others; and the fact that some Apple Employees went through Checks while others did not, will not be proven during Phase One. Rather, to the extent these "differences" and "inconsistencies" are relevant, they may be addressed by Apple during Phase Two of the litigation.

## 2.   **Phase Two**

If the Court or trier of fact during Phase One finds Apple created a Check policy; had knowledge Checks were being performed without compensation; and is obligated under California to compensate Apple Employees who went through Checks, the parties will proceed to Phase Two. As the first step in Phase Two, Plaintiffs will ask the Court to rule on a motion to appoint special masters pursuant to Federal Rule 53.  In that motion, Plaintiffs will request appointment of one special master from each California district (collectively, the "Special Masters") to adjudicate the claims of individual Class members who have not opted-out of the Class.

Under the Court's supervision and with the input of counsel, the Special Masters will formulate the most appropriate and cost-effective procedures for resolving the claims of Apple Employees who wish to participate in Phase Two, while at the same time affording Apple its due process right to contest those claims and interpose any defenses it wishes to assert (subject to any controlling rulings reached by the Court during Phase One.)   Available mechanisms for accomplishing this objective include interrogatory responses, questionnaires and individual hearings.  A second notice will then be disseminated to Apple Employees who have not opted-out advising them of these procedures and the proof they must offer to obtain relief from Apple for uncompensated Checks.  Under timetables set by the Court, the individual claim process will then

1  proceed and adjudications rendered by the Special Masters on the compensation, if any, to be
2  afforded members of the Class who participate in Phase Two.

3  During this phase, Apple will retain all its rights to defend itself and contest the claims of
4  Apple Employees who elect to participate.  For example, Apple can call Store Managers and other
5  witnesses to rebut the assertion of any Apple Employee that he or she went through
6  uncompensated Checks at a California Store.  With witnesses and payroll records, Apple can
7  likewise attempt to prove that an Apple Employee received compensation for the time he or she
8  went through Checks.  Further, to the extent Apple has individual defenses to the claims of an
9  Apple Employee, it can present those to the Special Master for appropriate consideration and
10  ruling.

11  The foregoing approach is substantively fair to all parties, who are free to assert their
12  claims and interpose their defenses; will avoid multiple and potentially inconsistent rulings from
13  different tribunals addressing the same facts and causes of action; and is expressly contemplated by
14  the Federal Rules for addressing precisely these types of factual scenarios.  It further avoids the
15  inequitable outcome of immunizing employers who adopt policies that force employees to work
16  without paying them, merely because the policies are "randomly" and "inconsistently" applied.

17  **IV.  M&S SHOULD BE APPOINTED CLASS COUNSEL**

18  Courts are also required to appoint class counsel under Federal Rule 23(g).  Here, Plaintiffs
19  request that the Court appoint M&S and The Kralowec Law Group ("KLG") as co-counsel for the
20  Class, with M&S serving as Lead Counsel.  M&S and KLG have actively litigated this case from
21  the outset, devoting many hours of attorney and paralegal time drafting pleadings, reviewing
22  documents, defending and taking depositions, attending conferences and hearings and preparing
23  and defending motions.  The firms are also highly experienced in prosecuting wage and hour class
24  actions of this nature.  *See* Shalov Dec. ¶ 5; Ex. 117 ¶¶ 2-4.  Both firms have also committed
25  substantial resources to the action and are committed to continue doing so in the future.

26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that their motion for certification under Federal Rule 23(c)(4) be granted, together with such other and further relief as this Court deems just and proper.

Dated: May 11, 2015

By:      _____/s/_____
Lee S. Shalov (admitted *pro hac vice*)
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY  10016

*Proposed Class Counsel for Plaintiffs and the Class*

PLAINTIFFS' MOTION FOR RULE 23(c)(4) CERTIFICATION OF PARTICULAR ISSUES
Case No. 13-cv-3451-WHA; Consolidated Case No. 13-cv-3775-WHA